## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

|  |  |
|---|---|
| **Franklin Ward,** | **Case No. 1:24-cv-00481-PAB** |
| **Plaintiff,** | |
| -vs- | |
| | **JUDGE PAMELA A. BARKER** |
| **Corrections Officer Shea Adkisson, et al.,** | |
| **Defendants.** | **MEMORANDUM OPINION & ORDER** |

Currently pending before the Court is the Motion of Defendants Shea Adkisson ("Adkisson")[1] and Phil Stammitti,[2] (collectively "Defendants") for Summary Judgment (the "Motion"). (Doc. No. 22.)  Plaintiff Franklin Ward ("Plaintiff" or "Ward") filed his Response to Defendants' Motion (the "Response") on October 6, 2025, and Defendants filed their Reply in Support of Summary Judgment (the "Reply") on November 14, 2025. (Doc. Nos. 29, 30.)  For the following reasons, Defendants' Motion (Doc. No. 22) is GRANTED IN PART AND DENIED IN PART.

## I.      Background

This matter involves an incident that occurred at the Lorain County Jail (the "Jail") on December 1-2, 2022. At that time, Plaintiff was detained at the Jail after having been arrested for suspicion of drug possession and obstruction of official business. (Depo. of F. Ward (Doc. No.

---

[1] Plaintiff sues Adkisson individually as well as in his capacity as a Corrections Officer for the Lorain County Sheriff's Department and the Lorain County Jail. (Doc. No. 1 at PageID #s 2-3, ¶¶ 6-7.)

[2] In the Motion, Defendants state that "Plaintiff does not specify whether Sheriff Stammitti is sued in his official or individual capacity." (Doc. No. 22 at PageID # 381.)  However, the Complaint provides that the action is brought against Stammitti "in his official capacity" as "the lawful Sheriff of Lorain County, Ohio." (Doc. No. 1 at PageID # 3, ¶ 11.)

21-1) at Tr. 27-28, 40-49; Doc. No. 22-4 at PageID # 509.) Defendant Phil Stammitti ("Stammitti") was the Lorain County Sheriff and Defendant Shea Adkisson ("Adkisson") was employed as a corrections officer at the Jail.

A. **Adkisson's Employment History and Use of Force Training**

Adkisson began his role as a corrections officer at the Lorain County Jail in February 2016. (Depo. of S. Adkisson (Doc. No. 20-1) at Tr. 15, 20.) Before Adkisson began working in this position, he attended a training academy for approximately three months where he received training regarding "jail minimum standards," including use of force. (*Id*. at Tr. 14-18.) Adkisson testified that he was instructed regarding techniques in use of force (such as "arm bars," "wrist locks," and "escort techniques") and was taught that "[m]y use of force is last resort." (*Id*. at Tr. 14-18.) After Adkisson completed this training, he received a certification and began working as a corrections officer at the Jail. (*Id*. at Tr. 19-20.) Adkisson continued working at the Jail in this role for nine years, until he left in 2025. (*Id*.) During this time, the Sheriff's Office's use of force policy emphasized using "the minimum amount of force needed for any kind of situation that happened." (Adkisson Depo. at Tr. 35-36.) Adkisson testified (and Plaintiff does not dispute) that he received initial and on-the-job training on the Sheriff's Office's use of force policy. (*Id*.) In addition, Adkisson testified that he received approximately eight hours of use-of-force training "annually," i.e., every year to year-and-a-half. (*Id*. at Tr. 34-37.) Adkisson testified that he had only minor disciplinary infractions related to absenteeism during his employment as a Jail corrections officer, and that he was sued for excessive force regarding one alleged lockdown incident in 2023.[3] (*Id*. at Tr. 48-50.)

---

[3] As Exhibits to their Motion, Defendants attach copies of two *pro se* complaints that were filed in the Northern District of Ohio relating to this 2023 lockdown incident, as well as a Memorandum Opinion & Order and Judgment Entry dismissing the complaints pursuant to 28 U.S.C. 1915(e). *See* (Doc. Nos. 22-1, 22-2.) *See also Meinke, et al. v.*

## B.     Plaintiff is arrested and detained at the Jail

On December 1, 2022, the Lorain County Police received calls regarding a male walking in and out of traffic. (Doc. No. 22-3 at PageID # 507.) Officers were dispatched at around 1:40 p.m. and quickly located and stopped the male in question. (*Id*.) Although he initially refused to identify himself, the male eventually told the officers that he was Ward. (*Id*.) The officers believed that Plaintiff was under the influence of narcotics and searched him. (*Id*; Ward Depo. at Tr. 36.) The officers reported (and Plaintiff does not dispute) that they found cocaine on Plaintiff's person. (Doc. No. 22-3 at PageID #s 506-07; Ward Depo. at Tr. 27-29.) Plaintiff was then arrested on suspicion of drug possession and obstructing official business and transported to the Jail. (Doc. No. 22-3 at PageID # 506-08; Ward Depo. at Tr. 36-39.)

It is undisputed that Plaintiff was "extremely intoxicated" when he was arrested on December 1, 2022. (Ward Depo. at Tr. 36.) Indeed, Plaintiff testified that on that day, he had taken cocaine, heroin (which Plaintiff testified "was probably Fentanyl"), Suboxone, Klonopin, and Methamphetamine. (*Id*. at Tr. 35-36.) Plaintiff acknowledged in his deposition that having these drugs in his system could have affected his memory. (*Id*. at Tr. 38.)

During the arrest, officers frisked Plaintiff, but the pat-down was no more invasive than that. (*Id*. at Tr. 37-38.) When he arrived at the Jail, Plaintiff was placed in the body scanner three times because he was "extremely intoxicated." (Ward Depo. at Tr. 38-40.) Plaintiff testified that the officers then stripped him naked in the shower, took his clothes, and provided jail clothes for

---

*Stammitti, et al.*, Case No. 1:23cv1175 (N.D. Ohio) (Doc. Nos. 4, 5); *Romero v. Stammitti, et al.*, Case No. 1:24cv00610 (N.D. Ohio) (Doc. Nos. 4, 5). Each of these complaints named Adkisson as a defendant.

3

him to wear.[4]  (*Id*.)  *See also* (Adkisson Depo. at Tr. 30-31.)[5]  Due to his intoxication, Plaintiff was placed in a "drunk tank" to sober up.  (Ward Depo. at Tr. 41.)

Early the next morning at approximately 5:30 a.m., Adkisson approached the drunk tank to escort Plaintiff to his housing assignment.[6]  (Ward Depo. at Tr. 41-43; Adkisson Depo. at Tr. 54-55.)  Plaintiff complained about the housing assignment and refused to go, stating that he wanted to "go to the hole" instead.  (Ward Depo. at Tr. 41-43; Adkisson Depo. at Tr. 54-55.)  Adkisson then left the area to complete some paperwork relating to Plaintiff's refusal to go to the assigned housing.  (*Id*.)  Adkisson returned to Plaintiff's cell, bringing with him a wristband[7] and Plaintiff's "face sheet."  (Adkisson Depo. at Tr. 55.)  Plaintiff, however, testified that he already had an "armband."  (Ward Depo. at Tr. 45, 93, 99.)

Defendants produced video surveillance footage ("VSF") showing what happened next.[8]  As the video begins, Adkisson is seen approaching the cell with a red wristband in his left hand and papers in his right, while Plaintiff is laying down on a blanket near the back-left wall of the

---

[4] The parties dispute whether Plaintiff was made to squat during this booking process.  Plaintiff testified that the booking officer ("Officer Board") made him squat.  (Ward Depo. at Tr. 37-38.)  The parties do not direct this Court's attention to any deposition testimony or affidavit from "Officer Board" or any other officer(s) that were involved in booking Plaintiff on December 1, 2022.  However, Adkisson did testify generally that squatting would only be ordered in a prison and not a jail.  (Adkisson Depo. at Tr. 30.)  Adkisson also testified that deputies are not authorized to perform body cavity searches.  (*Id*. at Tr. 30.)

[5] Although Adkisson was not involved in booking Plaintiff on December 1, 2022, he did testify generally regarding the booking process.  (Adkisson Depo. at Tr. 30-31.)  Specifically, Adkisson testified that when an individual is arrested, officers take him to the "shower room," where the individual then strips naked.  (*Id*.)  All of the individual's clothing is then put into a bag and the individual is provided with a "uniform to change into."  (*Id*.)

[6] Plaintiff was a self-described "frequent flyer" at the Jail and had interacted with Adkisson on previous occasions.  (Ward Depo. at Tr. 30; Adkisson Depo. at Tr. 54.)  The parties dispute the nature of Adkisson's previous interactions with Plaintiff.  Plaintiff testified that Adkisson had "roughed [him] up" during a previous encounter, while Adkisson testified that he "never had any issues with Mr. Ward whatsoever except [the date of the incident]."  (Ward Depo. at Tr. 31; Adkisson Depo. at Tr. 53.)

[7] Detainees receive a wristband with their photograph, booking number, and other information.  (Ward Depo. at Tr. 46.)  (Adkisson Depo. at Tr. 32-33) (describing booking process).

[8] The video surveillance footage does not have audio.

4

cell. (VSF at 00:00-00:03.) Adkisson opens the door and stands at the entryway of the cell. (VSF at 00:04-00:06.) Plaintiff slowly sits up, taking approximately thirty seconds to get into a seated position. (VSF at 00:06-00:35.) Plaintiff puts on his shoes. (VSF at 00:35-00:50.) Then, he proceeds to fold the blanket he was laying on. (VSF at 00:59-01:14.)

The parties dispute what happens next. As Plaintiff describes it: "I'm gathering my stuff and my armband falls. I go to pick up, and [Adkisson's], like don't do it, [expletive]. And it happened in a split second. He jumps on me." (Ward Depo. at Tr. 44.) At that point, Plaintiff testified that he "[fell] into the corner" and Adkisson "start[ed] whaling on [him]." (*Id*. at Tr. 45.) Conversely, Adkisson testified that, while he was waiting for Plaintiff to gather his belongings, "a bag of substance [fell] from [Plaintiff's] blanket." (Adkisson Depo. at Tr. 56.) Adkisson testified that he approached Plaintiff and asked him what it was. (*Id*.). Adkisson maintains that, when he got closer to Plaintiff, Plaintiff "reached down real quick." (*Id*.) Adkisson testified that he (i.e., Adkisson) went to reach for the bag that fell to the ground, but Plaintiff was able to reach it first. (*Id*. at Tr. 62.)

Adkisson then grabbed Plaintiff's torso and Plaintiff hit his head on the ground. (*Id*. at Tr. 56, 62.) *See also* (VSF at 01:18-01:22.) The rest of the footage, while obscured, appears to show Adkisson on top of Plaintiff while Plaintiff's legs move around. (VSF at 01:22-01:46.) Adkisson testified that he struck Plaintiff in the back twice "to gain compliance to give me his wrists." (Adkisson Depo. at Tr. 62-63.) It is undisputed that additional officers soon responded to the altercation. (*Id*. at Tr. 66-67; Ward Depo. at Tr. 41-44; VSF at 01:46-1:48, 2:09-2:13.) The parties also do not dispute that Plaintiff did not try to punch, kick, or strike Adkisson or the other responding officers. (Adkisson Depo. at Tr. 61-62.)

However, the parties do dispute whether Plaintiff resisted the officers' request to show his

hands. (Ward Depo. at Tr. 47; Adkisson Depo. at Tr. 61-62.) Adkisson testified that Plaintiff was "turning away from me trying to hide his contraband" and then "when we got to the ground he wouldn't give his hands up whatsoever." (Adkisson Depo. at Tr. 61, 62.) By contrast, Plaintiff testified that he was just "laying on the ground" and was not resisting. (Ward Depo. at Tr. 49.) Plaintiff further testified that he told the officers "[s]top... [y]ou guys are killing me" and indicated that he could not breathe. (*Id*.) Plaintiff testified that another officer then jumped on him, and that is the last thing he remembers before he woke up in the hospital. (Ward Depo. at Tr. 44.)

Adkisson testified that, while he was struggling with Plaintiff, he requested the assistance of additional officers. (Adkisson Depo. at Tr. 66.) He testified that, together, the officers were able to "get [Plaintiff's] hands free from under him and we placed cuffs on him and [he] went straight into the restraint chair." (*Id*. at Tr. 67.) *See also* (VSF at 2:35, 3:44-4:17.) Adkisson stated that, at that time, Plaintiff had a head injury "from hitting the ground." (Adkisson Depo. at Tr. 67.) He testified that, after Plaintiff was placed in the restraint chair, he was initially quiet because "he had something in his mouth." (*Id*. at Tr. 68.) Adkisson testified that he then heard Plaintiff making swallowing sounds. (*Id*. at Tr. 69.) Adkisson testified that Plaintiff swallowed whatever was in his mouth and then started cussing at the officers. (*Id*.) Adkisson testified that he assumed that what Plaintiff swallowed was "contraband;" i.e., drugs. (*Id*. at Tr. 69-70.) It is undisputed that no contraband was found in the cell. (*Id*.)

## C.    Plaintiff is transported to the hospital

After Plaintiff was restrained, a Jail nurse came to "assess [him] and check [his] restraints." (Doc. No. 22-5 at PageID # 510; Adkisson Depo. at Tr. 70.) About two hours later (at approximately 7:25 a.m.), Plaintiff was administered Narcan by Jail medical personnel. (Doc. No. 22-5 at PageID # 510.) Jail records indicate that, shortly thereafter, Plaintiff was treated by EMS

6

and transported to the hospital. (*Id.*) Hospital records[9] indicate (and it is undisputed) that Plaintiff was admitted to the hospital and remained there until December 8, 2022. (Doc. No. 22-6 at PageID # 590.)

The parties dispute the basis for Plaintiff's hospitalization. Plaintiff asserts that his hospitalization was due to injuries sustained from the altercation, while Defendants contend that he was hospitalized as a result of a drug overdose. Hospital records indicate that Plaintiff was initially treated for head trauma and underwent a battery of tests and imaging, including a CT scan of his head. (Doc. No. 22-6 at PageID #s 513-64.) Plaintiff's head wound was sutured at the hospital. (*Id.*) The emergency room ("ER") doctor indicated that Plaintiff "was initially medically cleared" and that he had planned to release him to police custody. (*Id.* at PageID # 564.) However, according to the ER records, Plaintiff then became difficult to arouse and "altered." (*Id.*) Plaintiff was administered additional doses of Narcan. (*Id.*) Hospital records indicate that his drug screen came back positive for cocaine, fentanyl, and meth. (*Id.*) The ER doctor indicated that "I am not sure what he ingested or if he is having rebound intoxication but he required intubation at this point." (*Id.*) Plaintiff was admitted to the ICU for "acute respiratory failure, toxic metabolic encephalopathy, polysubstance use abuse, [and] withdrawal." (*Id.* at PageID # 570.)

Hospital records indicate that Plaintiff was discharged on December 8, 2022, but that he "absconded from the hospital although he was supposed to go back to the correctional facility from whence he came." (*Id.* at PageID # 592.) Officers from the Lorain County Sheriff's Office subsequently located Plaintiff, arrested him, and transported him to the Jail. (Doc. No. 22-7 at

---

[9] Defendants attach as an Exhibit to their Motion certain medical records that were produced by Plaintiff in discovery. (Doc. No. 22-6.) The Court notes that, although these records contain Plaintiff's personal medical information, Defendants did not seek leave to file them under seal and, instead, filed them on the public docket. To ensure Plaintiff's privacy, this Court *sua sponte* restricted access to Plaintiff's medical records to case participants only.

PageID # 600.) Plaintiff testified that he did not recall almost anything that occurred in the hospital, absconding from the hospital, or how he wound up back at the Jail. (Ward Depo. at Tr. 52-54.) He testified that, after he was arrested on December 8, 2022, he was placed in isolation. (*Id.* at Tr. 54-62.)

## II.     Procedural History

On March 14, 2024, Plaintiff filed a Complaint in this Court against Defendants Adkisson, Stammitti, and John/Jane Doe Corrections Officers #1-7. (Doc. No. 1.) Therein, Plaintiff asserts the following six causes of action: (1) assault and battery; (2) excessive force under 42 U.S.C. § 1983; (3) failure to prevent excessive force under 42 U.S.C. § 1983; (4) failure to train under 42 U.S.C. § 1983; (5) intentional infliction of emotional distress; and (6) negligent infliction of emotional distress. (*Id.*) The first, second, third, fifth and sixth causes of action are asserted against Adkisson and John/Jane Doe #1-7 Defendants.[10] (*Id.*) The fourth cause of action is asserted against "Defendants Lorain County Sheriff's Department and Lorain County Jail." (*Id.* at PageID # 8.)[11] Defendants filed their Answer to the Complaint on June 28, 2024. (Doc. No. 8.)

---

[10] It is unclear whether Plaintiff's failure to prevent excessive force cause of action was brought against just the Doe Defendants *or* Adkisson and the Doe Defendants. (Doc. No. 1 at PageID # 7, ¶¶ 47-51.) Plaintiff alleges that the Doe Defendants are "liable for observing the obvious use of unnecessary and excessive force by Defendant Adkisson and failing to prevent such force when he/she had an opportunity and meant to prevent risk of harm occurring." (*Id.* at ¶ 48.) Plaintiff also alleges that the Doe Defendants "by failing to protect Plaintiff while acting under the color of state law, subjected Plaintiff to cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution." (*Id.* at ¶ 49.) In the following paragraphs, however, Plaintiff adds that he "was damaged by Defendant Adkisson and [the Doe Defendants'] failure to act in preventing the excessive use of force and such damages would not have happened if [the Doe Defendants had] intervened as his/her duty demanded to prevent the unlawful use of force." (*Id.* at ¶ 49.)

[11] Plaintiff asserts that the fourth cause of action is asserted against "Defendants Lorain County Sheriff's Department and Lorain County Jail." (*Id.*) However, the Lorain County Sheriff's Department and Lorain County Jail are not party defendants. The Court will construe the fourth cause of action as being asserted against

8

On August 5, 2025, Defendants filed their Motion for Summary Judgment.  (Doc. No. 22.) Plaintiff filed his Response on October 6, 2025, to which Defendants replied on November 14, 2025.  (Doc. Nos. 29, 30.)  Accordingly, the Motion is ripe for review.

### III.    Standard of Review

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). "A dispute is 'genuine' only if based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party."  *Henderson v. Walled Lake Consol. Sch.*, 469 F.3d 479, 487 (6th Cir. 2006).  "Thus, 'the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.'"  *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).  A fact is "material" only "if its resolution might affect the outcome of the suit under the governing substantive law."  *Henderson*, 469 F.3d at 487.

At the summary judgment stage, "[a] court should view the facts and draw all reasonable inferences in favor of the non-moving party."  *Pittman v. Experian Info. Solutions, Inc.*, 901 F.3d 619, 628 (6th Cir. 2018).  In addition, "the moving party bears the initial burden of showing that there is no genuine dispute of material fact."  *Ask Chems., LP v. Comput. Packages, Inc.*, 593 F. App'x 506, 508 (6th Cir. 2014).  The moving party may satisfy this initial burden by "identifying those parts of the record which demonstrate the absence of any genuine issue of material fact." *Lindsey v. Whirlpool Corp.*, 295 F. App'x 758, 764 (6th Cir. 2008).  "[I]f the moving party seeks summary judgment on an issue for which it does not bear the burden of proof at trial," the moving party may also "meet its initial burden by showing that 'there is an absence of evidence to support

the nonmoving party's case.'" *Id*. (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

Once the moving party satisfies its burden, "the burden shifts to the non-moving party who must then point to evidence that demonstrates that there is a genuine dispute of material fact for trial." *Ask Chems*., 593 F. App'x at 508–09. "[T]he nonmoving party may not simply rely on its pleading, but must 'produce evidence that results in a conflict of material fact to be solved by a jury.'" *MISC Berhad v. Advanced Polymer Coatings, Inc*., 101 F.Supp.3d 731, 736 (N.D. Ohio 2015) (quoting *Cox*, 53 F.3d at 150).

There is an "added wrinkle" where, as here, there is video evidence. *See Scott v. Harris*, 550 U.S. 372, 378 (2007). As the Sixth Circuit has explained, "[t]o the extent that videos in the record show facts so clearly that a reasonable jury could view those facts in only one way, those facts should be viewed in the light depicted by the videos." *Latits v. Phillips*, 878 F.3d 541, 547 (6th Cir. 2017) (citing *Harris*, 550 U.S. at 380). However, "[t]o the extent that facts shown in videos can be interpreted in multiple ways or if videos do not show all relevant facts, such facts should be viewed in the light most favorable to the non-moving party." *Id*. *See also Godawa v. Byrd*, 798 F.3d 457, 463 (6th Cir. 2015).

## IV.    Analysis

In the Motion, Defendants argue that (1) Plaintiff's alleged injuries were not caused by any custom or policy of the Sheriff's Office; (2) Adkisson is entitled to qualified immunity on Plaintiff's excessive force claim; (3) Adkisson is immune from Plaintiff's state law claims under RC 2755.03(A)(6); (4) Adkisson's actions were privileged; (5) Plaintiff did not observe a danger to a third person; and (6) Adkisson's actions were not extreme and outrageous and Plaintiff cannot prove that Adkisson caused his alleged psychological injuries. (Doc. No. 22 at PageID # 375.) In the Response, Plaintiff maintains that Defendants' arguments fail because genuine issues of

10

material fact preclude summary judgment on Plaintiff's excessive force and *Monell* claims,[12]

Adkisson is not entitled to qualified immunity, and this Court has supplemental jurisdiction over

Plaintiff's state laws claims. (Doc. No. 29 at PageID #s 699-707.)  In their Reply, Defendants argue

that (1) Plaintiff has abandoned his state law claims; (2) his *Monell* claim is unsupported by

evidence; and (3) "[t]he force used by Deputy Adkisson was reasonable under the circumstances,

and Plaintiff has provided no case law suggesting otherwise."  (Doc. No. 30 at PageID # 727.)

This Court will address these arguments below.

### A.    Federal Claims[13]

#### 1.  § 1983 Excessive Force Claim

In his Complaint, Plaintiff brings a § 1983 excessive force claim against Adkisson.  (Doc.

No. 1 at PageID #s 6-7, ¶¶ 41-46.)  Specifically, Plaintiff alleges that Adkisson:

> by applying force maliciously and sadistically to cause harm, not in a good faith
> effort to maintain or restore order, while acting under the color of law, deprived
> Plaintiff of rights, privileges, and immunities secured to him by the United States
> Constitution, including the prohibition on cruel and unusual punishment contained

---

[12] In *Monell v. New York City Dept. of Soc Servs.*, 436 U.S. 658, 694-95 (1978), the Supreme Court held that municipalities may be held liable under 42 U.S.C. § 1983 for the unconstitutional violations of their employees where the municipality's "policy or custom" was the direct cause of the violation.

[13] Plaintiff has failed to amend his complaint to add any identified Doe defendant and therefore, the Court must conclude that the Plaintiff has abandoned any claims or causes of action against the Doe defendants.  Accordingly, this Court grants summary judgment in favor of the Doe defendants on Plaintiff's second cause of action for excessive force in violation of 42 U.S.C. § 1983 and on Plaintiff's third cause of action for failure to intervene in violation of 42 U.S.C. § 1983. *See Nelson v. Corr. Corp. of Am.*, 2016 WL 1060308, at *4 (N.D. Ohio Mar. 14, 2016) (Nugent, J.) Also, nowhere in the parties' briefing do they discuss the viability of Plaintiff's third cause of action of failure to intervene purportedly or arguably brought against Adkisson. As this Court noted earlier, it is unclear from a reading of the Complaint whether Plaintiff brought this cause of action or claim against the Doe defendants or Adkisson and the Doe defendants.  Nevertheless, Plaintiff does not argue that he can bring a claim against Adkisson for his failure to intervene and prevent his *own* excessive force. *See Assi v. Hanshaw*, 625 F. Supp. 3d 722, 745 (S.D. Ohio 2022) (quoting *Grinnell v. City of Taylor*, 2022 WL 1562291, at *6 (6th Cir. May 18, 2022) ("According to the Sixth Circuit, an officer who fails to act to prevent the use of excessive force may still be held liable for that 'fail[ure] to intervene when (1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring.'")  Nor does Plaintiff otherwise sufficiently articulate or argue any other possible theory of liability for Defendant Adkisson under a failure to prevent excessive force theory  Accordingly, if Plaintiff's intent was to assert a cause of action for failure to prevent excessive force or intervene in violation of 42 U.S.C. § 1983 against Adkisson, the Court grants summary judgment in favor of Adkisson on that purported cause of action.

in the Eighth Amendment to the United States Constitution.

(*Id*. at ¶ 42.)

In the Motion, Defendants argue that Adkisson is entitled to qualified immunity with respect to this claim.  (Doc. No. 22 at PageID # 382.)  First, they argue that there was no constitutional violation. (*Id*.)  Defendants maintain that Adkisson was "familiar with Plaintiff as a frequent visitor to the jail," aware of the charges against Plaintiff, and knew that Plaintiff had spent the previous hours in the so-called "drunk tank."  (*Id*. at PageID # 383.)  They assert that Adkisson already knew that inmates do not receive their wristband until they are taken to housing and that the Jail did not conduct body cavity searches.  (*Id*. at PageID # 384.)  Based on the above, Defendants contend that (1) Adkisson's belief that Plaintiff had dropped a bag of narcotics and there was a need to intervene was reasonable, and (2) Adkisson could therefore use force against Plaintiff to prevent an overdose.  (*Id*.) (citing *Monday v. Oullette*, 118 F.3d 1099 (6th Cir. 1997) and *Caie v. West Bloomfield Twp*., 485 F.App'x 92, 96 (6th Cir. 2012)).

Next, Defendants argue that Adkisson "used the minimum amount of force necessary to accomplish this goal," by grabbing Plaintiff around the torso to prevent him from picking up the bag of narcotics.  (*Id*.)  Defendants maintain that Plaintiff "continued to actively resist," noting that multiple officers were needed to control Plaintiff. (*Id*.)  Defendants maintain that, given Plaintiff's active resistance, Adkisson reasonably "allowed Plaintiff to fall to the ground and administered hits with his elbow to obtain compliance."  (*Id*.)

Lastly, Defendants assert that "there exists no case law to put a reasonable corrections officer like Deputy Adkisson on notice that his actions violated Plaintiff's constitutional rights." (*Id.* at PageID # 383.)

12

In his Response, Plaintiff argues that "[t]he conflicting accounts of both the events leading up to and during the confrontation underscore material questions of fact that warrant determination by the jury." (Doc. No. 29 at PageID # 701.) Specifically, Plaintiff maintains that "he was cooperating and attempting to comply with instructions when the incident occurred," while Defendants "allege resistance and the presence of contraband, neither of which has been substantiated." (*Id*.) Plaintiff argues that, while the video footage provides "some visual insight," it does not resolve these issues. (*Id*. at PageID # 702.) In sum, Plaintiff asserts that there are genuine issues of material fact regarding the following issues: (1) whether contraband was present or Plaintiff was instead attempting to pick up his wristband; (2) whether Plaintiff was actively resisting and attempting to swallow contraband, or simply "trying to pick up his ID bracelet and was compliant"; (3) whether the amount of force used by Adkisson was reasonable; and (4), and whether Plaintiff's hospitalization was due to injuries that he sustained at the Jail as a result of the officers' actions or as the result of a drug overdose. (*Id*. at PageID #s 702-03.) Plaintiff maintains that a "reasonable jury could find, based on the evidence presented, that CO Adkisson's use of force was objectively unreasonable under the circumstances." (*Id*. at PageID # 703.)[14]

As to the clearly established prong of this Court's qualified immunity analysis, Plaintiff asserts that "highly particularized precedent" is not required and that "the prohibition against using excessive force on subdued detainees is self-evident." (*Id.* at PageID # 705.) He further maintains that, even if there was initial resistance, once Plaintiff "no longer posed a threat, continued use of force would be improper." (*Id*.) Lastly, Plaintiff argues that the Report of his expert, Michael Posey, establishes that Adkisson's actions exceeded any justifiable reaction. (*Id*.)

---

[14] Plaintiff also argues that the force used by Adkisson was not justified under Ohio Administrative Code 5120-9-01(2), but this Court need not reach this argument as it denies qualified immunity on other grounds.

In their Reply, Defendants argue that the force used on Plaintiff was reasonable. (Doc. No. 30 at PageID # 731). Defendants maintain that Adkisson's conduct was objectively reasonable because he "reasonably perceived that Plaintiff posed a threat to himself by attempting to access and ingest narcotics" and acted promptly to try to prevent that harm. In their view, the video footage supports the existence of contraband because Plaintiff made deliberate movements and later resisted Adkisson's efforts to restrain him by flailing his legs, attempting to face away from the floor, being verbally aggressive, etc. (*Id.* at PageID # 733.) They further contend that the video footage shows Plaintiff actively resisting by refusing Adkisson's orders to show his hands. (*Id.* at PageID # 732.) Defendants reiterate that Plaintiff's hospital stay was caused by a drug overdose and argue that, based on the timing of hospitalization, a reasonable jury could not find that Plaintiff did not ingest narcotics in the cell. (*Id.*) Lastly, Defendants argue that "there is no precedent establishing that every reasonable officer in [Adkisson's] position would have known his conduct violated Plaintiff's rights." (*Id.* at PageID # 733.)

To maintain a claim under 42 U.S.C. § 1983, a plaintiff must establish that he was deprived of a right secured by the Constitution or the laws of the United States, and that the deprivation was caused by a person acting under color of state law. *See West v. Atkins*, 487 U.S. 42, 48 (1988); *Simescu v. Emmet Cty. Dep't of Soc. Services*, 942 F.2d 372, 374 (6th Cir. 1991). Here, there is no dispute that Adkisson acted under color of state law. As such, the only remaining question is whether Plaintiff was deprived of a right secured by the Constitution or the laws of the United States.

However, "[p]olice officers are immune from civil liability unless, in the course of performing their discretionary functions, they violate the plaintiff's clearly established constitutional rights." *Mullins v. Cyranek*, 805 F.3d 760, 765 (6th Cir. 2015). To determine

14

whether an officer is entitled to qualified immunity, courts "apply a well-established two-prong test: (1) whether the facts, when taken in the light most favorable to the party asserting the injury, show the officer's conduct violated a constitutional right; and (2) whether the right violated was clearly established such that a reasonable official would understand that what he is doing violates that right." *Id*. These steps may be addressed in any order, and the defendant officer need only prevail on one of them to be granted qualified immunity. *See Coffey v. Carroll,* 933 F.3d 577, 584 (6th Cir. 2019); *Maben v. Thelen,* 887 F.3d 252, 269 (6th Cir. 2018).

With regard to the second step, "clearly established" means that the law is so clear at the time of the incident that every reasonable officer would understand the unlawfulness of his conduct. *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018). As the Supreme Court explained in that case:

> To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent. The rule must be "settled law," *Hunter v. Bryant*, 502 U.S. 224, 228, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (per curiam ), which means it is dictated by "controlling authority" or "a robust 'consensus of cases of persuasive authority,'" [*Ashcroft v. al–Kidd,* 563 U.S. 731, 741-42, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011)] (quoting *Wilson v. Layne*, 526 U.S. 603, 617, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)). It is not enough that the rule is suggested by then-existing precedent. The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply. *See Reichle* [*v. Howards*, 566 U.S. [658, 666,132 S.Ct. 2088, 182 L.Ed.2d 985 (2012).] Otherwise, the rule is not one that "every reasonable official" would know. *Id*., at 664, 132 S.Ct. 2088 (internal quotation marks omitted).
>
> The "clearly established" standard also requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him. The rule's contours must be so well defined that it is "clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). This requires a high "degree of specificity." *Mullenix v. Luna*, 577 U.S. ----, ----, 136 S.Ct. 305, 309, 193 L.Ed.2d 255 (2015) (per curiam). We have repeatedly stressed that courts must not "define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Plumhoff*, [*v. Rickard,* 572 U.S. ——, 134 S.Ct. 2012, 2023, 188

15

L.Ed.2d 1056 (2014)] (internal quotation marks and citation omitted). A rule is too general if the unlawfulness of the officer's conduct "does not follow immediately from the conclusion that [the rule] was firmly established." *Anderson* [*v. Creighton,* 483 U.S. 635, 640, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).]

*Id*. at 589-90. Thus, in evaluating whether a constitutional right was clearly established for purposes of qualified immunity, courts "must examine the particular situation that [the defendant officers] confronted and ask whether the law clearly established that their conduct was unlawful." *Howse v. Hodous*, 953 F.3d 402, 407 (6th Cir. 2020). *See also Aaron v. King*, --- F.4th ---, 2026 WL 890792 at * 2 (6th Cir. April 1, 2026) ("To prevail, [plaintiff] must establish a violation 'beyond debate,' ... which 'usually means the claimant must identify a case with facts similar enough that it squarely governs this one.'") (quoting *Moore v. Oakland County*, 126 F.4th 1163, 1167 (6th Cir. 2025) (internal citations omitted)).

The Court will address the two prongs of the qualified immunity test in turn below, beginning with the first.

### a. Violation of a Constitutional Right

It is undisputed that, at all times relevant herein, Plaintiff was a pretrial detainee. As the Sixth Circuit has explained:

> Persons in the criminal justice system invoke different constitutional amendments in their 42 U.S.C. § 1983 suits depending on their status. Arrested persons bring § 1983 claims under the Fourth Amendment's protection from unreasonable search and seizure. *See Graham v. Connor*, 490 U.S. 386, 388, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). **Detained persons, like Hale, do so under the Fourteenth Amendment's Due Process Clause. *See Kingsley v. Hendrickson*, 576 U.S. 389, 391, 135 S.Ct. 2466, 192 L.Ed.2d 416 (2015).** And convicted persons do so under the Eighth Amendment's protection from cruel and unusual punishment. *See Whitley v. Albers*, 475 U.S. 312, 318, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986).

*Hale v. Boyle County*, 18 F.4th 845, 852 (6th Cir. 2021) (emphasis added). Here, Plaintiff brings his excessive force claim under the Eighth Amendment in his Complaint but states in his Response

that Adkisson's actions violated his Fourth Amendment rights. (Doc. No. 1 at ¶ 42; Doc. No. 29 at PageID # 704.) However, given Plaintiff's undisputed status as a pretrial detainee, this Court properly analyzes this claim under the Fourteenth Amendment.[15]

To succeed on an excessive force claim under the Fourteenth Amendment, Plaintiff must show "that the force purposely or knowingly used against [him] was objectively unreasonable." *Kingsley v. Hendricksen*, 576 U.S. 389, 396-97 (2015). *See also Howell v. NaphCare*, 67 F. 4th 302, 320 (6th Cir. 2023). "The reasonableness of the force turns on the facts and circumstances of the particular case, and '[a] court must make this determination from the perspective of a reasonable [official] on the scene, including what the [official] knew at the time, not with the 20/20 vision of hindsight.'" *Howell,* 67 F.4th at 320 (quoting *Kingsley*, 576 U.S. at 397). "Factors that may bear on the reasonableness analysis include: 'the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.'" *Id*. (quoting *Kingsley*, 576 U.S. at 397.) *See also Whyde v. Sigsworth*, 2024 WL 4719649 (6th Cir. Nov. 8, 2024). Courts must make this totality-of-the-circumstances determination based on what a reasonable officer on the scene knew at the time and account for the jail's legitimate interest in maintaining their facility, "deferring to 'policies and practices that ... are needed to preserve

---

[15] Despite Plaintiff's pleading error, this Court will construe Plaintiff's claims under the Fourteenth Amendment. *See Williams v. Miniard*, 2023 WL 3113700, at *7 (S.D. Ohio Apr. 27, 2023) (overruling defendants' objections to the magistrate judge's report and recommendation that the Court should analyze the detainee's claim under the Eighth Amendment because that is what he had pled). As in *Williams*, Defendants "do not dispute that the Fourteenth Amendment's objectively unreasonable standard governs claims for excessive force against pretrial detainees." *Compare id*; *with* (Doc. No. 22 at PageID # 383.)

internal order and discipline and to maintain institutional security.'" *Cretacci v. Call*, 988 F.3d 860, 870 (6th Cir. 2021) (quoting *Kingsley*, 576 U.S. at 397) (internal citations omitted).

In evaluating these factors, the Court must consider the fact that the record contains video footage of the alleged excessive force incident at issue. Both the Supreme Court and the Sixth Circuit have discussed how courts should evaluate video footage when analyzing excessive force claims. In *Scott v. Harris*, 550 U.S. 372 (2007), the Supreme Court explained that "[a]t the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party," but "only if there is a 'genuine' dispute as to those facts." *Scott*, 550 U.S. at 380. The Court noted that:

> When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

*Id*. at 380–81. In *Scott*, the Court found that the plaintiff's "version of events is so utterly discredited by the record that no reasonable jury could have believed him." *Id*. Thus, the Court found that the lower court in that case "should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape." *Id*.

Interpreting *Scott,* the Sixth Circuit has held that "[t]o the extent that videos in the record show facts so clearly that a reasonable jury could view those facts in only one way, those facts should be viewed in the light depicted by the videos." *Latits v. Phillips*, 878 F.3d 541, 544 (citing *Scott,* 550 U.S. at 380.) However, "[t]o the extent that facts shown in videos can be interpreted in multiple ways or if videos do not show all relevant facts, such facts should be viewed in the light most favorable to the non-moving party." *Id*. Stated differently, where there are "relevant gaps or uncertainties left by [a] video[]," a court must view those "gaps and uncertainties" in the light

most favorable to the non-movant. *Id.* at 544. *See also Oliver v. Greene*, 613 Fed. App'x 455, 457 (6th Cir. 2015) ("Inferences supported by the record, including the video, remain drawn in favor of the non-moving party.")

Here, the Court has carefully reviewed the video surveillance footage and considered the parties' arguments with respect thereto. For the following reasons, the Court disagrees with Defendants that the video footage clearly contradicts Plaintiff's evidence of excessive force against Adkisson. To the contrary, the Court finds that the video could be interpreted in multiple ways and, therefore, should be viewed in the light most favorable to Plaintiff. *See Latits*, 878 F.3d at 544.

As noted *supra*, at the beginning of the video, Adkisson is seen approaching the cell with a red wristband in his left hand and papers in his right, while Plaintiff is laying down on a blanket near the back-left wall of the cell. The key portion of the video for purposes of the excessive force claim comes in the moments after Plaintiff has put his shoes on, stood up, and is in the process of folding his blankets.[16] The Court in particular focuses on the approximately three-minute period between 1:16 and 4:17 in the video footage. At the 1:16 mark, Adkisson walks into the cell as Plaintiff is folding his blankets. There is no audio and Adkisson's back is to the camera. At approximately 1:18, Adkisson reaches Plaintiff. At this point, both Adkisson and Plaintiff are partially obscured by a panel in the doorway. Plaintiff is holding the blankets in front of his body, and he appears to be looking down and beginning to bend over. The video does not clearly show Plaintiff's face, arms or hands, and the viewer cannot see what (if anything) may be on the cell floor. Suddenly, between 1:18 and 1:20 on the video, Adkisson pushes Plaintiff face first to the

---

[16] The Court notes that, while Plaintiff is sitting up, putting his shoes on, and stretching his arms, the video offers a good look at his arms and wrists. It does not appear from this video that Plaintiff is wearing a wrist or armband.

back left wall of the cell and puts his arms around Plaintiff's torso.  At 1:21 on the video, Adkisson and Plaintiff have shifted to a horizontal position near the back right wall of the cell.  At this point, Adkisson appears to be on top of the upper part of Plaintiff's body.

Adkisson and Plaintiff remain in this position from approximately 1:21 to 1:47. Because of the doorway panel, the video does not clearly show what either Adkisson or Plaintiff are doing with their arms or hands.  The video does show Plaintiff moving his legs around.  At 1:47 on the video, another Officer enters the cell to assist Adkisson.  By 2:04, Adkisson appears to be in a seated or kneeling position directly adjacent to Plaintiff on the concrete bunk (rather than lying on top of his torso).  Two additional Officers enter the cell at the 2:08 and 2:12 marks.  At approximately 2:12, one of the other Officers appears to be grasping or holding down Plaintiff's legs.  It is not entirely clear, but it appears that, between 2:12 and 2:33, Adkisson and another Officer are attempting to handcuff Plaintiff.  At approximately the 2:35 mark, the Officers (including Adkisson) move Plaintiff off the concrete bunk to a seated position on the cell floor. At this point, Plaintiff's hands are handcuffed behind his back.

At 2:42 on the video, another Officer brings a restraint chair into the cell.  Several seconds later, the Officers appear to be moving Plaintiff so that he is laying on his left side on the cell floor. By 2:41, the video shows several Officers (including Adkisson) bending over the general area where Plaintiff is lying down.  At 3:00 on the video, one of the Officers searches a shoe that had fallen off Plaintiff's foot.  Between 3:13 and 3:28 on the video, one of the Officers shakes out the blankets that Plaintiff had been using. Between 3:28 and 3:41, the Officers appear to be checking Plaintiff's clothing, as Plaintiff lies on the cell floor.  At 3:44 on the video, three Officers (including Adkisson) move Plaintiff to a seated position near the back left wall of the cell.  Smears of what appear to be blood can be seen on two spots on the floor (i.e., in the middle of the cell floor and

20

on the concrete bunk in the back right corner of the cell).  At the approximately 4:15 mark, three Officers (including Adkisson) move Plaintiff into a seated position in the restraint chair.[17]

Upon careful review, the Court finds that it is simply not clear from the video footage whether there was any contraband present in the cell and/or whether Plaintiff actively resisted during this incident.  The parties appear to agree that Adkisson's use of force was prompted by something falling to the cell floor while Plaintiff was folding his blankets.  Plaintiff testified that it was his armband, and he was trying to pick it up in an effort to be compliant; whereas Adkisson testified that it was "a bag of substance" (i.e., drugs) and that Plaintiff actively tried to grab it before Adkisson could reach it.  (Ward Depo. at Tr. 44; Adkisson Depo. at Tr. 56.)  While the video shows Plaintiff beginning to bend down and Adkisson reacting by pushing Plaintiff to the back wall, it is simply not clear what, if anything, fell from Plaintiff's blanket because the doorway panel obscures the view of the relevant floor area.  Nor is there any audio that might shed light on what exactly happened.  Likewise, the video does not clearly show whether Plaintiff actively resisted during all or part of this incident.  Plaintiff testified that, once Adkisson pushed him to the ground, he was just lying there and that Adkisson and the other officers nonetheless kept "whaling on him" and "beating him unconscious."  (Ward Depo. at Tr. 45, 49.)  Adkisson testified that Plaintiff was "turning away from me trying to hide his contraband" and then "when we got to the ground he wouldn't give his hands up whatsoever."  (Adkisson Depo. at Tr. 61, 62.)  The video

---

[17] Plaintiff does not allege that Adkisson (or any of the other Officers) used excessive force on him once he was in the restraint chair.

does not resolve this dispute because the doorway panel largely blocks a clear view of either Adkisson or Plaintiff during this incident and, again, there is no audio.[18]

In other words, the video does not show the facts regarding this incident so clearly that a reasonable jury could only view those facts in Adkisson's favor. Thus, the Court must view this portion of the video footage, as well as the deposition testimony, in a light most favorable to Plaintiff.

Viewing the evidence in this light, the Court finds that there are genuine issues of material fact regarding whether Adkisson's use of force was objectively reasonable. As discussed above, the video footage does not clearly show otherwise. While Adkisson testified that he initially used force on Plaintiff due to the presence of drugs in the cell, the video simply does not show what fell from Plaintiff's blanket and Plaintiff insists that it was just his armband and not contraband. Likewise, while Adkisson testified that Plaintiff was actively resisting by failing to show his hands, the doorway panel blocks a clear view of what Adkisson and Plaintiff were doing and there is no audio to provide context.

Defendants nonetheless argue that, viewing the totality of the circumstances, "it was reasonable for [Adkisson] to believe that the bag dropped by Plaintiff contained narcotics and that [Adkisson] needed to intervene." (Doc. No. 22 at PageID # 383-84.) Specifically, Defendants maintain that Adkisson knew that (1) Plaintiff was a "frequent visitor to the Jail;" (2) Plaintiff had been recently arrested for possession of a controlled substance and had just spent several hours in the drunk tank; (3) inmates do not receive their identification bracelets until they are taken to

---

[18] The video does show Plaintiff moving his feet, but Adkisson's testimony is that Plaintiff's resistance was in the form of refusing to obey commands to show his hands.

22

housing; and (4) the jail does not conduct cavity searches. (*Id.*) Citing several Sixth Circuit cases, Defendants argue that "the prevention of a drug overdose [is] a legitimate law enforcement objective warranting the use of force." (*Id.*)  Thus, Defendants argue that no reasonable jury could find that Adkisson's decision to use force was objectively unreasonable.[19]

The Court rejects this argument.  Plaintiff does not dispute that he was a "frequent flyer" at the Jail, that he had been arrested for possession of a controlled substance, or that he had been in the drunk tank overnight.  Nor does Plaintiff assert that the Jail conducted a cavity search on him prior to the incident.  Plaintiff also does not dispute the legal proposition that the use of force may be warranted to prevent a drug overdose.  Plaintiff does dispute, however, that (after being booked and required to shower, change clothes, and undergo three body scans) he still had drugs on his person and that he dropped them on the cell floor on the morning of December 2, 2022.  And the video simply does not answer this question.  Lastly, the fact that Plaintiff had a history of drug use and had been arrested for drug use the previous day does not, in and of itself, mean that no reasonable jury could believe Plaintiff's version of events.

Moreover, even if Adkisson reasonably believed that "the bag dropped by Plaintiff contained narcotics and that [Adkisson] needed to intervene," there is a further question regarding whether the degree of force used by Adkisson was objectively reasonable.  As noted above, "[f]actors that may bear on the reasonableness analysis include: 'the relationship between the need

---

[19] This Court declines to address Defendants' argument that Plaintiff is not a reliable historian because the Court is precluded from assessing credibility at this stage of the proceedings. (Doc. No. 30 at PageID # 728.)

In this vein, Defendants' argument that Plaintiff failed to dispute Adkisson's assertion that he heard swallowing sounds because Plaintiff testified that he was unconscious and as such has not offered evidence to the contrary also fails. (*Id.* at PageID # 728.)  Plaintiff already denied that he picked up any sort of bag, and more importantly, he maintains that he was unconscious and in doing so, affirms his assertion that was not swallowing narcotics when Adkisson said he was.

23

for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.'" *Howell,* 67 F. 4th at 320 (quoting *Kingsley*, 576 U.S. at 397) (hereinafter "the *Kingsley* factors").

Beginning with the last *Kingsley* factor,[20] the Court finds (for the reasons set forth above) that there is a genuine issue of material fact regarding whether Plaintiff was actively resisting during the time period between Adkisson's initiation of the use of force (1:18 on the video footage) and the point at which the officers were able to restrain Plaintiff in handcuffs (approximately 2:35 on the video footage).  The video footage does not clearly answer this question, and the parties have offered diametrically opposed testimony on this issue.  *See* (Ward Depo. at Tr. 49; Adkisson Depo. at Tr.  61-63.)

Regarding the remaining *Kingsley* factors, assuming that Adkisson reasonably believed that Plaintiff dropped contraband on the cell floor and was trying to ingest it, the Court agrees with Defendants that the presence of narcotics (and Plaintiff's alleged attempt to ingest it) posed a significant potential threat and that there was a legitimate need to act to address it.  *Monday v. Oullette*, 118 F.3d 1099 (6th Cir. 1997) (finding an officer's use of pepper spray to be reasonable where plaintiff refused to go to the hospital during a suspected overdose); *Caie v. West Bloomfield Twp.*, 485 F.App'x 92, 96 (6th Cir. 2012) (finding an officer's use of a taser to be reasonable where plaintiff's suicidal tendencies posted a threat to himself).

---

[20] The Court notes that neither party directly acknowledges nor addresses the *Kingsley* factors.  As the Court is bound by *Kingsley* and the many Sixth Circuit cases applying it, the Court will nonetheless address these factors herein.

24

The problem, however, is that the video is unclear regarding the amount of force used and whether Adkisson made any effort to temper or limit his use of force.   And, once again, the parties offered very different testimony regarding this issue.  As noted above, the video does not clearly show what exactly Adkisson did in his efforts to obtain access to the alleged contraband and prevent Plaintiff from ingesting it.  All that can clearly be seen is Adkisson pushing Plaintiff to the wall and then the concrete bunk, followed by Adkisson generally on top of the upper part of Plaintiff's body while struggling with him.  Adkisson testified that he struck Plaintiff in the back twice "to gain compliance to give me his wrists" but that he (i.e., Adkisson) did not use his fists. (Adkisson Depo. at Tr. 62-63, 81.)  Conversely, Plaintiff testified that (1) Adkisson "beat me unconscious and then woke me back up from being unconscious and knocked me back out again," and (2) he (i.e., Plaintiff) put his hands up to protect his head but that the officers were "punching my hands ... boom, boom, boom, just whaling on me."  (Ward Depo. at Tr. 48-49.)

Lastly, regarding the extent of Plaintiff's injury, it is undisputed that Plaintiff suffered lacerations and bruising to his head, which required treatment at the ER.  Defendants maintain that based on the timing of hospitalization, no reasonable jury could conclude that Plaintiff did not ingest narcotics in the cell.  (Doc. No. 30 at PageID # 733.)  As noted above, according to the ER records, Plaintiff was treated for his head injuries and initially cleared to be discharged back to the Jail.  However, he then became difficult to arouse and "altered," and his drug screen came back positive for cocaine, fentanyl, and meth.  (Doc. No. 22-6 at PageID # 564.)  Notably, the ER doctor indicated that "I am not sure what he ingested or if he is having rebound intoxication but he required intubation at this point."  (*Id*.)  So, although it is possible that Plaintiff's overdose could have been caused by the substance that Adkisson allegedly saw him ingest, a reasonable jury could also conclude that Plaintiff suffered from "rebound intoxication" as a reaction to the drugs he had

25

taken the previous day. Accordingly, viewing the evidence in a light most favorable to Plaintiff, this Court disagrees with Defendant that a reasonable jury could only conclude that Plaintiff must have ingested drugs at 5:30 a.m. on December 2, 2022.

In sum, viewing the totality of the circumstances in a light most favorable to Plaintiff, the Court finds that there is a genuine issue of material fact regarding whether Adkisson's use of force was objectively reasonable under the first prong of the qualified immunity analysis. Specifically, the Court finds that there is a genuine issue of material fact regarding whether Adkisson reasonably believed that Plaintiff was attempting to retrieve and ingest contraband, prompting him to use force to prevent Plaintiff from doing so. The Court further finds that, even if Adkisson reasonably believed that contraband was present and that Plaintiff was attempting to ingest it, there is a genuine issue of material fact regarding whether the degree of force used by Adkisson was objectively reasonable under the circumstances.

### b. Clearly Established Federal Law

Defendants assert that "there exists no case law to put a reasonable corrections officer like Deputy Adkisson on notice that his actions violated Plaintiff's constitutional rights." (Doc. No 22 at PageID # 383.) In his Response, Plaintiff asserts that "[t]he Sixth Circuit has established that assaulting an unarmed and compliant individual constitutes a clearly established violation" of federal law. (Doc. No. 29 at PageID # 704.) Plaintiff maintains that "highly particularized precedent" is not required, and that "the prohibition against using excessive force on subdued detainees is self-evident." (*Id.* at PageID # 705.) Lastly, Plaintiff argues that "even if there was some resistance initially, once Plaintiff was subdued and no longer posed a threat, continued use of force would be improper." (*Id.*) In their Reply, Defendants reiterate that "[t]here is no precedent establishing that every reasonable officer in [Adkisson's] position would have known his conduct

26

violated Plaintiff's constitutional rights" and cite cases that emphasize that a high level of generality is not sufficient to demonstrate that a violation is clearly established under federal law. (Doc. No. 30 at PageID # 732.)

"[Q]ualified immunity shields officers from damages liability for constitutional violations unless they act in a 'plainly incompetent' manner or 'knowingly violate the law.'" *Williams v. City of Canton*, 168 F.4th 933, 942 (6th Cir. 2026) (quoting *City of Tahlequah v. Bond*, 595 U.S. 9, 12 (2021) (per curiam)) (citation omitted). "To overcome a qualified-immunity defense, a plaintiff must show that an officer's use of force conflicted with 'clearly established' law." *Id.* (citation omitted). The Supreme Court held that for a right to be clearly established "'relevant precedent must define the right with a high degree of specificity' needed to make it 'clear to officers which actions violate the law.'" *Zorn v. Linton*, 2026 WL 795469, at *3 (March 23, 2026) (quoting *Wesby*, 583 U.S. at 63). The inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Coley v. Lucas Cnty., Ohio*, 799 F.3d 530, 540 (6th Cir. 2015) (quoting *Clemente v. Vaslo,* 679 F.3d 482, 490 (6th Cir. 2012)).

1. **When deciding whether a right is clearly established, the Court may not resolve genuine disputes of fact in favor of the party seeking summary judgment.**

"Courts must take care not to define a case's 'context' in a manner that imports genuinely disputed factual propositions." *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (emphasis added) (citing *Brosseau v. Haugen,* 543 U.S. 194, 195 (2004) (inquiring as to whether conduct violated clearly established law "'in light of the specific context of the case'" and construing "facts ... in a light most favorable to" the nonmovant). In *Tolan*, the Supreme Court vacated the Fifth Circuit's decision affirming the district court's grant of qualified immunity.

In that case, a police officer observed a vehicle turn quickly down a residential street, park, and then watched two men, plaintiff and his cousin, exit the vehicle. *Id*. at 651. The officer attempted to run the car's plate number. *Id*. However, he inadvertently entered "695BGK" instead of the correct plate number, which was "696BGK." *Id*. at 651-52. "That incorrect number matched a stolen vehicle of the same color and make." *Id*. The officer exited his vehicle and ordered plaintiff and his cousin to lay down on the ground. *Id*. They compiled while explaining that the car belonged to plaintiff. *Id*. Plaintiff's parents came out of house to help deescalate the situation, and the officer radioed for assistance. *Id*. While Plaintiff and his cousin remained on the ground, another officer, Sergeant Jeffrey Cotton, arrived on the scene. *Id*. The parties dispute what happened next. *Id*. Plaintiff testified that Cotton threw his mother against the garage door, offering evidence that the force was severe enough for her to bruise her arms and back. *Id.* at 653. Meanwhile, Cotton testified that he was escorting plaintiff's mother to the garage when she flipped her arms up to get his hands off her. *Id.* After seeing his mother being pushed, plaintiff testified that he rose to his knees in protest, but Cotton maintained that plaintiff rose to his feet. *Id.* Standing 15-20 feet away from plaintiff, Cotton shot him three times with one of the bullets entering his chest cavity and collapsing his right lung. *Id.*

The district court granted summary judgment in Cotton's favor, finding that he was entitled to qualified immunity because his use of force was not unreasonable and therefore did not violate the Fourth Amendment. *Id*. at 654. The Fifth Circuit affirmed, but on a different basis. *Id*. The Fifth Circuit declined to decide whether Cotton's actions violated the Fourth Amendment but held that, even if it did, Cotton was entitled to qualified immunity because he did not violate a clearly established right. *Id*. Specifically, the Fifth Circuit found that Cotton did not violate a clearly established right because an officer "had the right to use deadly force if that officer harbored an

28

objective and reasonable belief that a suspect presented an 'immediate threat to [his] safety.'" *Id*. at 654 (citation omitted).  In reaching this conclusion, the Fifth Circuit relied on the fact that plaintiff's mother refused Cotton's orders and that plaintiff "was 'moving to intervene in' Cotton's handling of his mother" and "that Cotton therefore could reasonably have feared for his life." *Id*. at 655 (citation omitted).

The Supreme Court vacated the Fifth Circuit's decision, finding that it "credited the evidence of the party seeking summary judgment and failed properly to acknowledge key evidence offered by the party opposing that motion." *Id*. at 659.  The Supreme Court held that, under either prong of the qualified immunity analysis, "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Id*. at 657.  The Court explained:

> This is not a rule specific to qualified immunity; it is simply an application of the more general rule that a "judge's function" at summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson* [*v. Liberty Lobby,* 477 U.S. 242, 242-43, 106 S.Ct. 2505, 2507, 91 L.Ed.2d 202 (1986)].  Summary judgment is appropriate only if "the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. Rule Civ. Proc. 56(a).  In making that determination, a court must view the evidence "in the light most favorable to the opposing party."
>
> Our qualified-immunity cases illustrate the importance of drawing inferences in favor of the nonmovant, even when, as here, a court decides only the clearly-established prong of the standard.  In cases alleging unreasonable searches or seizures, we have instructed that courts should define the "clearly established" right at issue on the basis of the "specific context of the case." *Saucier*, *supra*, at 201, 121 S.Ct. 2151; *see also Anderson v. Creighton*, 483 U.S. 635, 640–641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).  Accordingly, courts must take care not to define a case's "context" in a manner that imports genuinely disputed factual propositions. *See Brosseau*, *supra*, at 195, 198, 125 S.Ct. 596 (inquiring as to whether conduct violated clearly established law " 'in light of the specific context of the case' " and construing "facts ... in a light most favorable to" the nonmovant).

*Id*. at 656-57 (citation omitted).  Because the Fifth Circuit failed to view the evidence at summary judgment in the light most favorable to plaintiff in evaluating the clearly established prong of the

qualified immunity analysis, the Supreme Court found that it "improperly weighed the evidence" and reversed.

In the instant case, as discussed at length *supra*, genuine disputes of material fact preclude this Court from deciding whether Adkisson reasonably believed that there was contraband, whether Plaintiff resisted Adkisson's efforts to handcuff him, and whether the amount of force Adkisson used was reasonable. Applying *Tolan*, this Court must assume for the sake of its qualified immunity analysis that Adkisson could not have reasonably believed that Plaintiff bent down to pick up contraband and that Plaintiff did not resist Adkisson's efforts to handcuff him. It must also accept Plaintiff's testimony as to the amount of force that Adkisson used, namely that Adkisson and the other officers nonetheless kept "whaling on him" and "beating him unconscious" despite his protestations that they were killing him and he could not breathe. *See* (Ward Depo. at Tr. 45, 49.)

With the above in mind, the Court finds that Plaintiff does not need to cite to highly particularized cases to clearly establish a violation of his constitutional rights because, construing disputed facts in his favor, such a violation is obvious.[21]

---

[21]  In his Response, Plaintiff references two cases in an attempt to show that Adkisson's actions violated his clearly established right to be free from excessive force. Plaintiff's citation to *Nelson v. City of Battle Creek* is unpersuasive. (Doc. No. 29 at PageID # 704) (citing 802 F. App'x 983, 984 (6th Cir. 2020). The Sixth Circuit reversed the district court's holding, finding that "the law was not so clearly established that every reasonable officer would know that shooting [the boy] under these specific circumstances would constitute excessive and unconstitutional use of force." *Id.* at 985. This case can be distinguished from the instant action. *Nelson* involved an officer shooting rather than a beating of a plaintiff., and more importantly, in *Nelson*, the Sixth Circuit held that the boy's constitutional rights were *not* clearly established. As such, *Nelson* does not clearly establish Plaintiff's constitutional right to be free from excessive force.

Plaintiff's reference to *Abdur-Rahim v. City of Columbus* is similarly uncompelling. (Doc. No. 29 at PageID # 704) (citing 825 F. App'x 284, 286 (6th Cir. 2020)). The Sixth Circuit reversed the district court's holding finding that "no clearly established law barred [the officer's] conduct." *Id.* at 286. *Abdur-Rahim* involves the pepper-spraying of a protestor and not the beating of a pre-trial detainee, and like in *Nelson*, in *Abdur-Rahim*, the Sixth Circuit held that the protestor's constitutional rights were *not* clearly established. Accordingly, neither of the cases cited by Plaintiff are analogous to the instant action.

**2. Reasonable corrections officers would have understood that they could not tackle a detainee without cause and then beat him unconscious when he was not resisting their orders.**

Plaintiff need only "identify 'a body of relevant case law' more specifically tailored to a given case" if he identifies the clearly established law "at a high level of generality." *Williams*, 168 F.4th at 942 (citing *Bond*, 595 U.S. at 12.) "[A] plaintiff has defined a legal right at this inappropriately high level whenever 'the unlawfulness of the officer's conduct "does not *follow immediately* from"' the identified right." *Id.* (quoting *Wesby*, 583 U.S. at 63). *See also Jackson v. City of Cleveland*, 64 F.4th 736, 750 (6th Cir. 2023) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)) (citation omitted) ("[A]n official 'can still be on notice that their conduct violates established law even in novel factual circumstances.' … 'Although earlier cases involving "fundamentally similar" facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding.'").

"The Supreme Court regularly applies these principles to excessive-force cases." *Williams*, 168 F.4th at 942 (collecting cases). "This test might supply the required clearly established law in 'an obvious case' in which all reasonable officers would have immediately known that a suspect did not pose the required threat." *Id.* (citing *Rivas-Villegas*, 595 U.S. 1, 6 (2021)). *See also id.* ("It has repeatedly recognized that [*Tennessee v. Garner*, 471 U.S. 1, 3 (1985)] articulated its deadly-force test (that officers may use deadly force only if a suspect poses a threat of serious harm) 'at a high level of generality.'")[22]

---

[22] Many of the cited cases involve the application of qualified immunity under the Fourth Amendment rather than the Fourteenth Amendment. However, "[w]hen assessing excessive-force claims under the Fourth or Fourteenth Amendments" "we inquire whether the plaintiff has shown "that the force purposely or knowingly used against him was objectively unreasonable." *Hopper v. Phil Plummer*, 887 F.3d 744, 752 (6th Cir. 2018) (citations omitted).

31

Applying these standards here, this Court must ask: Would all "'reasonable'" corrections officers "'have understood'" that they could not tackle a detainee without cause and then beat him unconscious when he was not resisting? *Id*. (quoting *Rivas-Villegas*, 595 U.S. at 5).  As discussed below, this Court finds that reasonable corrections officers in Adkisson's position would have understood that they could not tackle a compliant detainee and then beat him unconscious.

Consider some holdings from the Sixth Circuit on the matter.  In *Phelps v. Coy*, 286 F.3d 295 (6th Cir. 2002), "[t]he facts, taken in the light most favorable to [plaintiff], showed that" during the booking process, defendant officer "saw [plaintiff's] foot approach [another officer's] face, and he concluded that [plaintiff] was trying to kick [the other officer]." *Id*.  The defendant officer "tackled the handcuffed [plaintiff]." *Id*.  "As the two fell to the ground, with [the defendant officer] on top of [plaintiff], [the defendant officer] told [plaintiff], he wouldn't be permitted to kick 'one of his officers,' and [the defendant officer] hit [plaintiff] in the face twice." *Id*. at 297-98.  "Then, '[w]hile holding [plaintiff's] shirt collar, [the defendant officer] proceeded to slam his head into the floor at least three times.'" *Id*. at 298.  The defendant officer moved for summary judgment in his favor on the basis of qualified immunity.  The district court denied the motion, finding that the facts taken in the light most favorable to the plaintiff indicated that the defendant officer used unnecessary force, in violation of plaintiff's clearly established Fourth Amendment rights.  *Id*. at 286.

The Sixth Circuit affirmed.  Under the first prong of the qualified immunity analysis, the court first found that "there is no doubt that the facts, taken in the light most favorable to [plaintiff], establish a violation of [plaintiff's] rights." *Id*. at 301.  Next, under the second prong of the qualified immunity analysis, the Sixth Circuit found that "the unreasonableness of the alleged facts .... was clearly established at the time of the events in this case." *Id*. at 302.  In so finding, the

court noted "the facts recited by the district court would permit a finding that [the defendant officer] inflicted on [plaintiff] a beating that was not only unnecessary, but also would have been recognized as unnecessary by a reasonable officer in his position." *Id*. at 302.

In *Lawler v. City of Taylor*, an unreported Sixth Circuit decision, during booking, plaintiff refused the officer's order to place his hands on the table and uttered an offensive remark at the officer.  268 F. App'x 384, 386 (6th Cir. 2008).  The videotape showed what happened next:

> [Plaintiff] raised his left arm slightly and [the officer] tackled him to the floor face-down, struggled with him for a few moments and struck him forcefully three times—twice slamming his knee into [plaintiff's] back (once with [plaintiff's] arm pulled back at an awkward angle) and once hitting him with his elbow.  Though [plaintiff] resisted being handcuffed, [the officer] remained on top of him at all times, and [plaintiff] never freed himself from [the officer's] control.  Several other officers eventually entered the booking room and helped handcuff [plaintiff], who complained about pain in his arm.  Two officers escorted him to the hospital for treatment of what turned out to be a broken arm.

*Id.*  The district court denied the defendant officer's request for qualified immunity on plaintiff's excessive force claim.  *Id*.  On appeal, the Sixth Circuit affirmed, concluding that the district court correctly found that the plaintiff's right to be free from such force was clearly established."  *Id.* Specifically, citing *Phelps*, the Sixth Circuit noted "**that an officer's use of gratuitous force in a booking room—beyond the point at which any threat could have been reasonably perceived—violated the individual's clearly established rights.**"  *Id*. at 388 (emphasis added).

Likewise, in *Burgess v. Fischer*, 735 F.3d 462, 470 (6th Cir. 2013), the Sixth Circuit reversed a district court's grant of qualified immunity to the defendant officer where a handcuffed plaintiff "was taken to the ground during the booking process because he made an offensive remark, despite being physically compliant and presenting no threat." *Evans v. Plummer*, 687 F. App'x 434, 442 (6th Cir. 2017) (affirming district court's denial of qualified immunity where officer can be seen "throwing [detainee] and slam[ming] her head-first onto the concrete floor,

knocking her unconscious.")[23]  In subsequent cases, the Sixth Circuit has noted that "[a]fter *Burgess*, it is 'beyond debate' that performing a takedown on a detainee who is physically compliant, not a threat, and not attempting to flee violates the Fourth Amendment.'"  *Id.* (finding that *Burgess* clearly established detainee's constitutional rights to be free from excessive force) (citing *Burgess*, 735 F.3d at 470) (citation omitted).

The Sixth Circuit's reported decisions in *Phelps* and *Burgess* clearly establish that Adkisson's alleged use of force against Plaintiff is unlawful.  Construing all disputed facts in Plaintiff's favor, Adkisson's alleged tackling and beating of Plaintiff when he did not pose a threat to himself or Adkisson violated Plaintiff's clearly established rights.  Further, the Sixth Circuit has "repeatedly held that when the legal question of qualified immunity depends on which version of the facts one accepts, the jury, not the judge, acts as the final arbiter of immunity." *Withers v. City of Cleveland*, 640 F. App'x 416, 419 (6th Cir. 2016) (citations omitted).  "This is especially true where, as here, [the Court] must view the facts in the light most favorable to the plaintiff on a motion for summary judgment." *Id.*  Since reasonable officers in Adkisson's position would be aware that they may not tackle a detainee without reason and then beat that unarmed, compliant individual to the point where he loses consciousness and suffers serious physical harm, this Court denies Adkisson qualified immunity.

### 2.  Failure to Train

Plaintiff brings a § 1983 failure to train cause of action against "Defendants Lorain County Sheriff[']s Department and the Lorain County Jail" that as noted earlier, the Court will construe as against Defendant Sheriff Stammitti  (Doc. No. 1 at PageID # 8, ¶¶ 52-56.)  He alleges that the

---

[23] In *Evans*, the Sixth Circuit distinguished that action and *Burgess* from another Sixth Circuit decision by noting that in both of those cases, like in the action before this Court, there was a dispute as to whether the plaintiffs posed a threat or actively resisted arrest.  687 F. App'x at 442.

34

Sheriff's Office has a "documented history of failing to train its personnel" and "a pattern of conduct for failing to train its personnel." (*Id*. at ¶¶ 53-54.) Plaintiff alleges that the Sheriff's Office "failed to provide proper training for their personnel thereby resulting in the violation of Plaintiff's constitutional rights" and "failed to promulgate policies, plans, and procedures designed to protect the civil rights of the persons who come into contact with its officers thereby resulting in the violation of Plaintiff's constitutional rights as described above." (*Id*. at ¶ 56.)[24] For the reasons set forth below, this Court grants summary judgment on Plaintiff's *Monell* Claim.

In the Motion, Defendants argue that "Plaintiff's alleged injuries were not caused by a policy or custom of the Lorain County Sheriff's Office." (Doc. No. 22 at PageID# 381. Defendants highlight the training that Adkisson received in his role as a corrections officer on the Sheriff's Office's use of force policy and argue that Adkisson's "ongoing training met constitutional standards." (*Id*. at PageID #s 381-382.) Defendants further assert that Adkisson's actions during the December 2, 2022 incident were "consistent with both his training and nationally accepted correctional practices." (*Id*. at PageID # 382) (citing Expert Report of S. Faulkner (Doc. No. 22-8.))

In his Response, Plaintiff argues that "genuine issues of material fact preclude summary judgment on Plaintiff's *Monell* claim." (Doc. No. 29 at PageID # 705.) He then asserts (summarily) that the "Lorain County Sheriff's Office has a documented history of excessive force incidents and inadequate training." (*Id*. at PageID # 706) (citing Expert Report of M. Posey (Doc. No. 29-1)).

---

[24] To the extent Plaintiff attempts to proceed under an inaction theory in addition to its failure to train claim, that claim fails for the same reasons set forth below. *See Bagjett v. Bilanow*, 2020 U.S. Dist. LEXIS 127607, *22 (E.D. Mich. July 21, 2020).

In their Reply, Defendants first argue that the report of Plaintiff's expert, Michael Posey, "contains no opinion at all about the adequacy of [Adkisson's] training in use of force and de-escalation techniques." (Doc. No. 30 at PageID # 730.) Defendants next assert that "a failure-to-train claim…requires a showing of 'prior instances of unconstitutional conduct demonstrating that the [office] ha[d] ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury.'" (*Id*.) (quoting *Miller v. Sanilac Cnty*., 606 F.3d 240, 255 (6th Cir. 2010)). Defendants maintain that "Plaintiff's opposition contains no examples of any prior instances of unconstitutional conduct within the Lorain County Sheriff's Office" and argue that the four incidents referenced in Mr. Posey's report are "hearsay and unsupported by any evidence suggesting that [they are] true or accurate." (*Id*.) Lastly, even assuming the Court were to consider the list of four incidents in Mr. Posey's report, Defendants argue that merely listing other cases is not sufficient. Rather, Defendants maintain that "[a] plaintiff must also provide evidence demonstrating that the prior instances were factually similar to the case at bar." (*Id*. at PageID # 731.) Because Plaintiff fails to do so herein, Defendants argue that they are entitled to summary judgment in their favor with respect to his failure to train claim. (*Id*.)

It is well-established that a municipal entity may not be sued for injuries inflicted solely by its employees or agents under § 1983. *Monell v. Dept. of Soc. Servs. Of City of New York*, 436 U.S. 694 (1978). *See also Baynes v. Cleland*, 799 F.3d 600, 620 (6th Cir. 2015); *D'Ambrosio v. Marino* 747 F.3d 378, 386 (6th Cir. 2014); *Heyerman v. Cnty. of Calhoun*, 680 F.3d 642, 648 (6th Cir. 2012). Rather, a plaintiff may only hold a municipal entity liable under § 1983 for the entity's own wrongdoing. *Gregory v. City of Louisville*, 444 F.3d 725, 752 (6th Cir. 2006) ("Section 1983 does not permit a plaintiff to sue a local government entity on the theory of *respondeat superior*.")

36

(citing *Monell*, 436 U.S. at 692–94). Or, as the Sixth Circuit has explained, "a municipality is liable under § 1983 only where, 'through its deliberate conduct,' it was 'the 'moving force' behind the injury alleged.'" *D'Ambrosio,* 747 F.3d at 388-389 (quoting *Alman v. Reed*, 703 F.3d 887, 903 (6th Cir. 2013) (citation omitted)).

"Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). To properly allege a municipal liability claim, a plaintiff must show "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013); *see also D'Ambrosio*, 747 F.3d at 386. Moreover, a plaintiff must show a "direct causal link between the custom and the constitutional deprivation; that is, [he] must show that the particular injury was incurred because of the execution of that policy." *Doe v. Claiborne Cnty.,* 103 F.3d 495, 508 (6th Cir. 1996) (internal quotation marks omitted); *see also Baynes v. Cleland*, 799 F.3d 600, 621 (6th Cir. 2015)*; Fair v. Franklin Cnty.,* 215 F.3d 1325, 2000 WL 659418, at *3 (6th Cir. 2000) ("*Monell* requires that a plaintiff identify the policy, connect the policy to the city itself and show that the particular injury occurred because of the execution of that policy."); *Garner v. Memphis Police Dep't,* 8 F.3d 358, 364 (6th Cir. 1993) (same).

Here, Plaintiff proceeds against Sheriff Stammitti under a failure to train theory of *Monell* liability. (Doc. No. 1 at PageID # 8, ¶¶ 52-56.) To plead a failure to train or supervise claim, the plaintiff must demonstrate that: "(1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3)

the inadequacy was closely related to or actually caused the injury." *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006)).  A failure to train claim can succeed "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989).

> ### a.  Plaintiff does not discuss the adequacy of the Sheriff's use of force training.

This Court agrees that neither Plaintiff's Response (Doc. No. 29) nor Mr. Posey's Expert Report (Doc. No. 29-1) discuss the adequacy of the Sheriff's training on use of force.  Defendants cite to *Howell v. NaphCare, Inc.*, 67 F.4th 302, 319-20 (6th Cir. 2023), wherein the plaintiff argued that the defendant county failed to train its employees on the use of restraint chairs.  (Doc. No. 22 at PageID # 382.)  In that case, the Sixth Circuit found that the plaintiff "failed to show a genuine dispute of fact regarding whether the training was deficient in substance." *Id.* at 320.  Therein, the defendant county "offered initial training, and, while it did rely on on-the-job training, that training was ongoing" and the defendant officers "displayed knowledge of and familiarity with the relevant polices that governed restraint chairs, which the [plaintiff's] expert agreed were reasonable and appropriate." *Id.*

Here, Plaintiff does not dispute that Adkisson received initial and on-the-job training on the Sheriff's Office's use of force policy.  The Sheriff's use of force policy emphasized using "the minimum amount of force needed for any kind of situation that happened."  (Adkisson Depo. at Tr. 36.)  As noted *supra*, before Adkisson began working as a corrections officer, he attended an academy full-time for about three months, wherein he was instructed on the use of force.  (*Id*. at Tr. 16-17.)  Further, in his nine years as a corrections officer, he has been subject to annual on-

the-job training regarding the use of force.[25]  (*Id*.at Tr. 21, 34–37, 85.)  Plaintiff does not dispute

the facts that Defendants introduce describing Adkisson's training.  In fact, he fails to address the

adequacy of the training at all.  In sum, aside from Mr. Posey's opinion that the Sheriff's Office

demonstrated a pattern of excessive force, which this Court will discuss below, Plaintiff offers no

evidence to support his claim that the Sheriff's Office's training was lacking.

> **b. Posey's conclusion that the Sheriff's Office failed to train its officers merely because other complaints have been lodged against it is insufficient to create a genuine dispute of material fact.**

Citing Mr. Posey's Expert Report, Plaintiff argues that the "Lorain County Sheriff's Office

has a documented history of excessive force incidents and inadequate training."  (Doc. No. 29 at

PageID # 706.)  In his Report, Mr. Posey opines (in relevant part) as follows: I examined several

incidents related to the Lorain County Sheriff's Department and incidents pertaining to the

excessive use of force.  The incidents below are examples of documented excessive force incidents

involving former Lorain County Sheriff's Department employees:

- **December 2024** – Deputy ordered an inmate's door open to engage in a fist fight.
- **May 2023** – Deputy was accused of ramming an inmate headfirst into a wall resulting in paralysis of the inmate.
- **August 2023** – Deputy assaulted an inmate and was charged criminally.
- **December 2022** – Deputy is being sued for excessive use of force.

(Doc. No. 29-1 at PageID #s 714-15.)  In their Reply, Defendants argue that "this information is

hearsay and unsupported by any evidence suggesting that it is true or accurate."  (Doc. No. 30 at

PageID # 730.)  Although he could have done so, Plaintiff did not seek leave to file a Sur-Reply

to address this argument.

---

[25] In his Deposition, Adkisson testified that he received training on this policy "[e]very year. I want to say annually, so a year, year a half."  (Adkisson Depo. at Tr. 36.)

"Merely listing other cases alleging similar complaints against the municipal entity is insufficient to create a genuine issue of material fact on which a jury could find that such a policy exists." *Bagjett v. Bilanow*, 2020 U.S. Dist. LEXIS 127607, *22 (E.D. Mich. July 21, 2020) (citing *Thomas v. City of Chattanooga*, 398 F.3d 426, 430 (6th Cir. 2005) (applying *Thomas* in an action for failure to train).  In *Thomas*, the Sixth Circuit affirmed the district court's grant of summary judgment as to plaintiff's *Monell* claim, wherein he alleged that the municipality had an unwritten policy of condoning the use of force against potential suspects.  398 F.3d at 430.  The district court held that plaintiff's expert witness's findings were conclusory.  *Id*. at 432.  In that case, the expert witness's first affidavit "was two pages and the relevant portion in its entirety stated":

> Based on my experience with other cities in cases similar to this one, the number of formal civil cases alleging use of excessive force by police officers filed against the City of Chattanooga indicates that ... Chattanooga Police Department uniformed officers acted within an informal, unwritten policy, practice, or custom wherein the unlawful use of force-the use of excessive force-was tolerated. In my experience, this "culture" must necessarily have been known to Chattanooga Police Department ... illustrated by the fact that [Captain Crumley, Head of the Internal Affairs Division,] recommended that Officer Abernathy's shooting of [plaintiff] be "...carried as justified."[26]

*Id*. at 430.  The expert witness then submitted a second affidavit wherein he added "that he had reviewed statistical evidence, consisting of some of the complaints and civil cover sheets from the forty-five suits filed against the Chattanooga Police Department alleging use of excessive force since July of 1994." *Id.*

---

[26] In *Thomas*, the expert witness argues that a policy of inaction can be gleaned from the fact that the police department's investigation determined that the shooting was justified.  398 F.3d at 430  ("There must have been a policy or custom of condoning excessive force in the Chattanooga Police Department because there had been several complaints of excessive force against the Department in the past, and because here, in [the expert witness's] opinion, officer Abernathy had violated the Department's written 'use of force' policy and yet his actions were deemed justified by the Department.")

The Sixth Circuit pointed out that the expert witness "had not examined the details of any of these suits beyond merely looking at the complaints." *Id.* The expert witness ultimately asserted that:

> [T]here must have been a policy or custom of condoning excessive force in the Chattanooga Police Department because there had been several complaints of excessive force against the Department in the past, and because here, in [the expert witness's] opinion, officer Abernathy had violated the Department's written "use of force" policy and yet his actions were deemed justified by the Department.

*Id.* In its analysis, the Sixth Circuit noted that the expert witness "did nothing to inform the court as to whether most of the complaints were serious or frivolous" and "also failed to explain how one could evaluate the mere number of complaints in a vacuum to come to a conclusion about the Department's policies." *Id.* at 430-31. "Moreover, [the expert witness] failed to present any data upon which the Court could compare or contrast the number of excessive force complaints made by citizens of Chattanooga with the number of excessive force complaints in similarly-sized cities or in cities with a similarly sized police force." *Id.* at 431 (quotation omitted).[27]

"Being an expert does not lessen the burden one has in rebutting a motion for summary judgment." *Id.* at 432. "In fact '[i]f the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached ... and how that experience is reliably applied to the facts. The trial court's gatekeeping function requires more than simply "taking the expert's word for it."'" *Id.* (quoting FED. R. EVID. 702 advisory committee's note) (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1319 (9th Cir. 1995)).

---

[27] The Sixth Circuit also found that the district court "did not make a credibility determination because the issue was not [the expert witness's] credibility; the issue was whether [he] could substantiate his opinion where necessary." *Id.*

Here, Posey lists four incidents where a Sheriff's Office deputy was either accused of, criminally charged with, or sued for the alleged use of excessive force on inmates.[28]  There is no indication, however, that Posey "examined the details of any of these suits beyond merely looking at the complaints."  *See Thomas*, 398 F.3d. at 430.  In addition, Posey does not explain whether these four alleged incidents were "serious or frivolous."[29]  *See id*.  He "also failed to explain how one could evaluate the mere number of complaints in a vacuum to come to a conclusion about the [the Sheriff's] policies."  *See id*. at 430-31.  "Moreover, [Posey] failed to present any data upon which the Court could compare or contrast the number of excessive force complaints made by citizens of [Lorain County] with the number of excessive force complaints in similarly-sized cities or in cities with a similarly sized police force."  *See id*. at 431 (quotation omitted).  In sum, Posey does not offer any support for his conclusions, and this Court cannot simply take his "word for it."

Thus, this Court finds that Plaintiff's Expert Report is insufficient to create a genuine issue of material fact on which a jury could reasonably find that the Sheriff failed to adequately train his officers and the Motion is granted as to the fourth cause of action of failure to train.

---

[28] One of the incidents that Posey cites to does not specify whether the victim was an inmate, pretrial detainee, or other.  This Court notes that Plaintiff here was a pre-trial detainee.

[29] This Court notes that the expert witness in Thomas looked at forty-five (45) lawsuits.  *See id*.

42

**B.** **State Law Claims**

    **1. Assault and Battery Cause of Action**

Plaintiff's first cause of action is for assault and battery against Adkisson. (Doc. No. 1 at PageID #s 5-6, ¶¶ 36-40.) Plaintiff alleges that Adkisson "struck and physically assaulted him" and that "his actions had a great probability of causing [him] substantial harm." (*Id*.) Plaintiff further alleges that, as a direct and proximate result of Adkisson's "negligent and/or intentional conduct," Plaintiff incur[red] severe physical and mental injuries, including head injuries and neurological damage, physical and mental pain and suffering, impaired mental capacity, medical, and therapeutic and other damages." (*Id*.)

In the Motion, Defendants first argue that Plaintiff's claim for assault and battery fails because Adkisson's actions were privileged under Ohio common law. (Doc. No. 22 at PageID # 386.) Second, Defendants maintain that Adkisson is immune from all of Plaintiff's state law claims (including his assault and battery claim) under R.C. 2744.03(A)(6). (*Id*. at PageID # 375.)

In the Response, Plaintiff first argues that this Court has supplemental jurisdiction over his state law claims, including his claim for assault and battery. (Doc. No. 29 at PageID # 706.) Plaintiff does not address Defendants' argument that Adkisson's actions are privileged under Ohio common law. (*Id*.) Plaintiff does, however, argue that Adkisson is not entitled to immunity under RC 2744.03(A)(6) because "this immunity does not apply if the employee's acts were 'with malicious purpose, in bad faith, or in a wanton or reckless manner.'" (*Id*.) Plaintiff asserts that "[g]iven the factual disputes regarding CO Adkisson's conduct and the expert testimony that his actions were excessive and violated correctional standards, a reasonable jury could find that CO Adkisson acted with malicious purpose, in bad faith, or in a wanton or reckless manner." (*Id*.)

In their Reply, Defendants argue that Plaintiff failed to address Defendants' argument

regarding common law privilege and, therefore, Plaintiff abandoned his assault and battery claim. (Doc. No. 30 at PageID # 729.)  Regarding immunity under RC 2744.03(A)(6), Defendants argue that Plaintiff's argument is conclusory and that he "has failed to point to evidence in the record to support" it.  (*Id*. at PageID # 734.)  Defendants further assert that, because Adkisson is entitled to qualified immunity, he is also immune from the state law claims under RC 2744.03(A)(6).  (*Id*.) (citing *Hopper v. Plummer*, 887 F.3d 744, 760 (6th Cir. 2018)).

For the reasons set forth below, the Court finds that Adkisson is not entitled to summary judgment in his favor with respect to Plaintiff's assault and battery cause of action.

First, the Court finds that there is a genuine issue of material fact regarding whether Adkisson is immune from suit under § 2744.03(A)(6).  "Under Ohio law, officers enjoy immunity from tort liability unless they act "'with malicious purpose, in bad faith, or in a wanton or reckless manner.'"  *Abdur-Rahim v. City of Columbus,* 825 F. App'x 284, 288–89 (6th Cir. 2020) (quoting R.C. § 2744.03(A)(6)(b)).  "Ohio courts define 'malicious purpose' as 'the willful and intentional design to do injury, or the intention or desire to harm another, usually seriously, through conduct that is unlawful or unjustified.'"  *Id*. (quoting *Caruso v. State*, 737 N.E.2d 563, 567 (Ohio 2000)).  "Ohio cases add further to our understanding by holding that 'bad faith' implies 'a dishonest purpose, moral obliquity, conscious wrongdoing, [or] breach of a known duty through some ulterior motive or ill will....'"  *Id*. at 288-89 (quoting *Cook v. Hubbard Exempted Vill. Bd. of Educ.*, 688 N.E.2d 1058, 1061 (Ohio 1996)) (citation omitted).  "'Wanton misconduct is the failure to exercise any care toward those to whom a duty of care is owed in circumstances in which there is great probability that harm will result.'"  *Id*. (quoting *Anderson v. City of Massillon*, 983 N.E.2d 266, 273 (Ohio 2012)).  "And reckless conduct is 'the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is

44

substantially greater than negligent conduct.'" *Id.*

"'Generally, issues regarding malice, bad faith, and wanton or reckless behavior are questions presented to the jury.'" *Id.* (quoting *Schoenfield v. Navarre*, 843 N.E.2d 234, 239 (2005)). A jury here could conclude that Adkisson acted recklessly or with malicious purpose in tackling Plaintiff and then beating him.

Second, this Court rejects Defendants' argument that Plaintiff waived his assault and battery claim by failing to respond to their privilege argument. In the Motion, Defendants argue Adkisson's actions were privileged under Ohio common law and contend that "[u]nder Ohio law, officers are privileged to use force—including conduct that would otherwise constitute assault or battery—when effectuating a lawful seizure." (Doc. No. 22 at PageID # 386) (citing *Morrison v. Horseshoe Casino*, 2020-Ohio-4131, ¶ 88 (Ohio App. 8th Dist. Aug. 20, 2020)) (citations omitted). Defendants rely on *Morrison* to support this assertion, but there, the Eighth District Court of Appeals relied on the Fourth District Court of Appeals which held that "privilege is negated by the use of excessive force." 2020-Ohio-4131, ¶ 88 (quoting *Alley v. Bettencourt*, 730 N.E.2d 1067, 1073 (Ohio App. 4th Dist. 1999). Defendants also cite to *Hemphill v. Department of Rehabilitation and Corrections*, wherein an Ohio Court of Claims magistrate judge found that "Ohio courts have held that, in a civil action for assault and battery, the defendant has the burden of proving a defense of justification, such as the exercise of lawful authority." (Doc. No. 22 at PageID # 386) (citing *Hemphill*, 2019-Ohio-5466, ¶ 18 (Ct. of Claims 2019) (citing *Brown v. Dep't of Rehab. & Corr.*, 2014-Ohio-1810, ¶ 13 (Ohio App. 10th Dist. 2014))[30] However, in that case, the magistrate judge, quotes from the Ohio Administrative Code 5120-9-019(C)(2) and provides that "correction

---

[30] This case involved an inmate and not a pretrial detainee.

45

officers 'may use force only to the extent deemed necessary to control the situation.'" (*Hemphill*, 2019-Ohio-5466, ¶ 22 (citing *Brown,* 2014-Ohio-1810, ¶ 16.))

In other words, under the authority cited by Defendants, Adkisson's use of force would need to be lawful for any privilege to apply, and if there are "allegations of use of unnecessary or excessive force" Plaintiff may state a claim for battery. (*Id*. at ¶ 18.) This Court has found that genuine issues of material fact preclude it from reaching a determination as to whether there was a constitutional violation and thus, Defendants' privilege argument fails.

Thus, this Court denies summary judgment in favor of Defendants on Plaintiff's cause of action for assault and battery.

### 2. Intentional Infliction of Emotional Distress ("IIED") and Negligent Infliction of Emotional Distress ("NIED") Causes of Action

Lastly, Plaintiff's Complaint sets forth causes of action for intentional and negligent infliction of emotional distress against Adkisson. (Doc. No. 1 at PageID #s 8, ¶¶ 51-59, 60-63.) Plaintiff alleges that Adkisson "intended to cause severe emotional distress to Plaintiff" and "know[s] or should have known that his unprovoked assault and battery would result in emotional distress to Plaintiff." (*Id*. at PageID # 9, ¶¶ 58-59.) Plaintiff also alleges that Adkisson owed him a duty of care to act as an ordinary and prudent person under the circumstances at issue in the Jail and breached that duty "by willfully assaulting him[and] causing him severe mental distress." (*Id*. at PageID # 9, ¶¶ 58-59.)

Defendants move for summary judgment in their favor with respect to both causes of action. As to the IIED claim, Defendants first argue that "Adkisson's actions do not rise to the level of extreme and outrageous," asserting that "[h]e acted within the scope of his duties and training to prevent what he reasonably perceived as a risk to Plaintiff and other deputies and

46

inmates in the jail." (Doc. No. 22 at PageID # 387.) Defendants further assert that this claim fails because Plaintiff failed to prove that his injury (i.e., PTSD) was caused by the incident with Adkisson, as opposed to by other causes such as being placed in isolation. (*Id*.) As to the NIED claim, Defendants assert that Plaintiff "cannot satisfy the threshold requirement of his [NIED] claim" because he fails to show that Adkisson's actions placed a third party in danger. (*Id*. at PageID # 386.)

In his Response, Plaintiff fails to acknowledge or address Defendants' arguments with respect to either his IIED or NIED causes of action. (Doc. No. 29.) In their Reply, Defendants contend that, by failing to address Defendants' arguments, Plaintiff has abandoned these causes of action. (Doc. No. 30 at PageID # 729.)

This Court agrees with Defendants that Plaintiff has abandoned his IIED and NIED causes of action. Nowhere in the Plaintiff's Response does he address the arguments raised by Defendants in support of granting summary judgment in their favor in these causes of action. *See Nathan v. Great Lakes Water Auth.,* 992 F.3d 557, 564 n.1 (6th Cir. 2021) (plaintiff abandoned claims not discussed in opposition to motion for summary judgment or on appeal); *Brown v. VHS of Michigan, Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) ("This Court's jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment."). *See also Lisan v. Wilkie*, 835 F. App'x 831, 834-35 (6th Cir. 2020); *Nowlin v. Nova Nordisk Inc.*, 2018 WL 1805141 at *3 (6th Cir. Feb. 28, 2018); *Haddad v. Sec'y, U.S. Dep't of Homeland Sec.*, 610 F. App'x 567, 568 (6th Cir. 2015); *Hicks v. Concorde Career Coll.*, 449 F. App'x 484, 487 (6th Cir. 2011).

Thus, this Court grants summary judgment as to Plaintiff's IIED and NIED causes of action.

## V.     Conclusion

For the reasons set forth herein, Defendants' Motion (Doc. No. 22) is GRANTED IN PART AND DENIED IN PART as follows.  Summary judgment in favor of Defendants on Plaintiff's causes of action for failure to prevent excessive force under 42 U.S.C. § 1983, failure to train under 42 U.S.C. § 1983, intentional infliction of emotional distress, and negligent infliction of emotional distress is granted.  The Court denies summary judgment in favor of Defendants on Plaintiff's causes of action for assault and battery and excessive force under 42 U.S.C. § 1983.

**IT IS SO ORDERED.**

_s/Pamela A. Barker_
PAMELA A. BARKER
U. S. DISTRICT JUDGE

Date:  April 15, 2026